Before you start to argue and before your time starts to run out, I'd just like to clarify, to get clarification of something I find very confusing, which is the status of Redigi's version 2.0. I understood the district judge to say 2.0 was developed after the close of discovery or something like that, and I haven't considered it, and it's not a part of this case. Redigi argues about 2.0 in the blue brief, and Capitol, in the red brief, answers in a footnote saying 2.0 is not a part of this case. The district judge didn't consider it, it's just not a part of this case. But the injunction, which was created by the parties in a stipulated fashion to carry out the district court's judgment, expressly enjoins 1.0 and 2.0. So is 2.0, was it intentional that the parties realized that they were, in drafting this injunction, that they would have the court enjoin 2.0 as well as 1.0, although the district court has said, I didn't consider it, it's not a part of this case? And a further question, if 2.0 was implemented in place of 1.0 and the injunction is intended only to enjoin 1.0, it's not enjoining anything that was happening at the time that 1.0 had been replaced. So can somebody clarify for us? Let me try, Your Honor, because I'm an appellate counsel and was not present at the district court proceedings, but here's my understanding. Redigi 2.0 was, in fact, discussed by my client in discovery during the case. However, it was never examined by capital. It came up late in the discovery period, and as a result, capital, as my understanding, allowed discovery to close without an examination of Redigi 2.0. I noticed in the district court's argument, capital's attorney conceded that they have no evidence that anyone has ever downloaded a capital sound recording using Redigi 2.0. So I don't even know that there's standing yet for capital to be complaining about it. Despite that. The district judge said, 2.0 is not part of this case, but the injunction that was written, that was prepared by the parties, says 2.0 is enjoined. Because after the summary judgment was issued, capital then added new defendants, and we had a new discovery period opening up. And so as a result, this case wasn't resolved until several years later. And in that period of time, because the court's injunction remained in place, Redigi was simply losing money and simply could not afford to go to trial in the case and still have any opportunity of coming up here for an appeal. So Redigi was sort of put in a hard spot of deciding what to do in that circumstance. Well, if it's a question of conserving your resources, which is always a valid concern, I follow that. Let's understand your position. If we were to agree with the district judge that 1.0 was properly enjoined, do you agree that covers 2.0? I believe it does not cover 2.0, Your Honor, because the logic of the district court has no bearing on how Redigi 2.0 actually operates. Redigi 2.0 allows for the sound recording that an individual downloads from Apple to be sent directly to Redigi's server. It never goes to the consumer's computer. So it works differently. It works completely differently. And in the event, I appreciate you don't like to contemplate this prospect, but if we were to think he was right with respect to 1.0, would you then, despite the wording of the judgment of the injunction, be urging us to remand for a trial as to whether 2.0 infringes? Absolutely I would. That would be your position? That would be our position. Okay, just so we understand. Does that answer your question, Your Honor? I suppose it does in part, but I thought you just told us you don't have the resources to try 2.0. Well, Your Honor, what will happen is if this court remands the case back to the district court, we have investors who have already made their presence known to the bankruptcy court in Florida that they will invest money in this company because they believe that if that injunction is overturned, they have a very highly profitable... Then the investors come. But what I was trying to get at is if we were to say everything the district judge said about 1.0 is correct, I don't know about your investors, I'm not so sure they would run quite as quickly to invest in 2.0. Again, if you look at the very different way that the systems operate, you will see that the district court's argument with regard to 1.0 simply has no bearing on the way 2.0... In any event, that's the remedy you'd be seeking. Yes. So what if the court were to say it's foolish for us to be considering this appeal at a time when it doesn't cover 2.0, when 2.0 has not been adjudicated by the trial judge, and 2.0 is a replacement for 1.0, the injunction enjoins nothing, and so it should be remanded to the district court to make a decision that comprehends, with further proceedings, that comprehends 2.0 as well as 1.0. What about that? Well, I very much see your point, Your Honor. However, I do believe that the district court's ruling with regard to 1.0 was erroneous. Of course you do, but I mean, what difference does it make? Well, I guess it makes a difference with regard to our understanding of the extent to which copyright law can control the electronic distribution of sound recordings. That's really what this case is about, the extent to which the copyright law comes in to control these things as opposed to, say, a contract law. This case is about contract copyright law. All right. We're going to start the clock. Can I put it slightly differently? Okay. If we thought we should remand so that 2.0 gets litigated, are you saying that that trial needs to be guided by whatever we say about 1.0? I think the court's guidance as to 1.0 would be very informative for the district court as to 2.0. And to be sure we're not deciding a moot question, I take it there's an existing damage award with respect to infringement of 1.0? Yes, there is. It's stipulated. That's the amount. Yes. Has it been paid? It is being partially paid by one of the defendants, who is not in bankruptcy. The other defendants are in bankruptcy. But when you say it's being partially paid, in other words, money has actually changed hands? Money has actually changed hands, yes. Mr. Rudolph, who is a defendant in this case, he is now paying a portion of his monthly salary. Was there a supersedious bond for the amount? No, Your Honor. So it's been partially paid and exists as an outstanding debt to the extent it hasn't been paid? That is correct. Which wouldn't be effective if we remand to consider version 2? Well, it depends on whether, yes, it depends on the scope of the remand, I guess. Because if you go back to the stipulated judgment, it provides that if this court remands the And as a result, they will no longer be a creditor. We'll be back, and we will be back in the district court adjudicating. It makes no sense whatsoever. I mean, this case involves, purports to involve, essentially the survival of an industry. Is there a resale marketplace for digital or not? And there's a high likelihood that the Supreme Court would take this case. And if this case is only judging the superseded technology and isn't judging the current technology, both our court and the Supreme Court would be wasting time, and a long time would pass before anything would be resolved that's of practical value. So it seems to me kind of ridiculous to have this case be adjudicated by us and then go up possibly to be adjudicated by the Supreme Court, taking a whole lot of time and accomplishing nothing if the only judgment that comes out of the appeals is with respect to superseded technology and not to the rule 1.0 is enjoined. I mean, supposing that the highest court to pass on it says 1.0 is enjoined. But as the district court said, 2.0 hasn't even been adjudicated. So go back and... But it was still enjoined. Yes, it was still enjoined. It's still subject to the judgment and it is enjoined. Even though it wasn't awarded. And money was awarded. Money wasn't awarded for 2.0. Money was awarded for 1.0. Money was awarded for 1.0. That is correct, Your Honor. And presumably you're here to tell us that shouldn't have happened. I am indeed, Your Honor. If we let you, you're going to get to it. But I do want to ask one other thing on this preliminary issue. Was, if you can tell us this, was the mention of 2.0 in the judgment inadvertent or was it a candid recognition that your client didn't have the resources to litigate 2.0 after all it had done to support 1.0? I believe it was a candid sort of recognition that the client didn't have the resources to be able to... This was not a Scribner's error. No, this was not a Scribner's error. No. All right, now we'll begin the clock. All right. Thank you. Again, just for the record, my name is Robert Welsh and I'm representing appellants. May it please the Court. I want to... I will focus on certain aspects of this appeal, namely whether or not district court was correct in its conclusion that Redigi's technology violated capital's reproduction or distribution rights. Counsel for amici copyright law scholars will address the first sale and fair use issues presented in the case, given our time. I'll begin with capital's claim of infringement of the reproduction right. As this Court knows, under Section 106.1, capital has the exclusive right to reproduce the copyrighted work in copies or phonorecords. And I'm going to want to spend a little time that I have talking about the definition of copies and phonorecords, but I'd like to point out at the outset one thing the Copyright Act does not do is define what is a reproduction. What we see, though, is that, as a result, courts will determine whether there has been a reproduction based on an examination of the actual conduct of the defendant. That did not occur here. The district court acknowledged that Redigi's... that how Redigi's technology worked was a disputed issue of fact and, therefore, it could not determine how Redigi's technology actually worked. So, unable to make a finding of violation of the reproduction right, that activity, based upon an examination of Redigi's activity, instead, the court found a violation of the reproduction right based upon the court's mistaken definition of phonorecord. And that alone is the basis of the district court's holding and really is the source of the error in the district court's holding. The district court contended that the definition of phonorecords referenced to material objects had to mean that the object had to be a physical object, like a vinyl record or a CD. And if the phonorecord was not a physical object, then it didn't meet the test of a phonorecord. So what did that mean in the context of this case? The court looked and it said, well, a consumer will have a copy of an Apple iTunes music file on its computer and then Redigi's process occurs and now that version is over in Redigi's server. Well, I can't actually examine that process because that's a disputed issue of fact. But I have one phonorecord here. I think that I've got another phonorecord over here. That must mean that Redigi somehow has recreated or I should say proliferated a copy into Redigi's server. Migrate is the verb I think they like. Below we did use the word migrate. I just prefer the straight out transfer, but it's a transfer. So what difference, if he's right, that what is over there, as you view it, is in law a copy, what difference electronically how it got there? Well, it makes a big difference because the real issue in this case is does Redigi's technology cause a reproduction of Capital's copyrighted work to be created even for a fraction of an instant of a second? And the answer, based on the uncontroverted evidence presented by Redigi, is that Redigi's technology does not, it never does cause the creation of a second instance, of a second copy of the copyrighted sound recording. Well, I thought as you just, with your arms, showed us going, there was a copy here at your left, and then what was over to the right? Just with my arms, the copy of my book is here, and now the copy of my book is here. There is a copy of a book. It's the same book. The book was here. Oh, because you physically moved the book. I physically moved it, and that's what Redigi's technology does. So you say that the computer into which it is received, when the digital file goes into a computer and is now available in that computer, that is not a new copy. That is like the computer is like a device for the perceiving of the file. That's exactly our position, is that the computer is like the record player. It is not the phono record, and that's the court's basic confusion in this case. It confused the record player for the phono record. So how do you deal with the word material? I deal with the word material actually in much the same way that the court in the London Sire Records case did, which is a case cited by Capital. In London Sire Records, I'd just like to point out to the court, that court ruled that electronic files are material objects. There's an entire portion of the opinion that's under the title, electronic files are material objects. Yes, but then the court very curiously said, or perhaps more properly put, the portion of the hard drive that contains it. And those 11 words that Your Honor has just referenced are the only 11 words that Capital wants to rely on out of the London Sire Records case. And I view that as complete dicta, because having determined already, as the London Sire Court did, that an electronic file was a material object that embodied a sound recording and that provided the digital code to allow that embedded sound recording to be perceived by the aid of an MP3 player, the iTunes music file actually satisfies all the requirements of the definition of phono records under the Copyright Act. And once you appreciate the possibility that the phonorecord itself, that the electronic file can be the phonorecord itself, then it's no longer impossible to be able to transfer, not copy, but transfer an electronic file from one computer to another without causing a second copy or any other copies to be made. That's the key. There's only one copy ever made. One copy ever made. And if your lawyers are curious about how that could possibly happen, is this just somebody playing word games with the court? I'd be happy to describe the process to you. Why isn't that vulnerable to the argument? It seems to me that argument leads to the result that if I acquire, I buy from iTunes a digital song, and I then cause the transfer of my digital file to friend A's computer, friend B's computer, friend C, friend D, and I also then decide I'm sick of it, and I resell it through Redigi, and it goes to F, no copying has occurred. But, Your Honor, in that system, in that instance that you've described, Redigi's system will actually detect whether or not there are any other copies of a particular... Was it detected previously? I don't know if it can detect whether previously. But again, it's... Pardon me? The district judge didn't rule on the efficacy of Redigi's claims that it detects and destroys. It didn't rule on the efficacy? It didn't claim to destroy associated computers. On my hypothetical that I just gave you, I have transferred it to six friends or some hundred friends, and those are not associated computers, and Redigi doesn't claim to be able to destroy those. No, no, it doesn't. Any more than a used CD store claims to be able to destroy any copies that you may have made of your CD when you send it off to friends or made additional copies before you came to the CD store and sold it. No less than a bookstore. The bookstore doesn't ask, hey, have you Xeroxed this copy of this book before I buy it from you? And if so, I want to go back to your house and look and see? No one does that, nor are they required to. The point here, Your Honor, is that within Redigi's system, there is no possibility of being able to duplicate an iTunes music file. My question was a little bit different. My question was, what I intended to ask was, following your definitions in which you say there has been no copying when the thing goes from first purchaser through Redigi to second repurchaser. That does not involve the making of a copy. As according to that argument, it also follows that no copy is made when I have transferred it to 600 or 6,000 friends. No, that's different, Your Honor. Why is it different? Because that would be unauthorized. Unauthorized. There's a big difference. I don't have the right to make copies for my friends. You're saying there's no copy made. It's not a copying. Okay, now I understand the issue, Your Honor. When you transfer copies to your friends, you're not using Redigi's system. You're using whatever. But when it goes from my computer and I transmit it to somebody else's computer, all that's happening is that it's going into a viewing device, a perceiving device. It's not creating another copy. It's just going to another device. As I understand that argument, it means that no matter how many are distributed, there's no copying. No copies have been made because it's just the file has just gone to other places that can view it. Under Redigi, I may not be tracking you, Your Honor, but under Redigi's system, once you install Redigi's media manager software onto your computer, which you have to do in order to utilize Redigi's system, once that occurs, you are only able, using Redigi's system, to transfer the original source iTunes music file to Redigi's server. Using that process, it results in all of the data that originally comprised that music file in the consumer's computer now no longer is perceivable. You're saying my hypothetical can't happen when you've downloaded the media manager? Yes. After you install Redigi's system, it can't happen, but you can do it before you install it. Yes, just like I can copy a book before I take it into the used bookstore and sell it. Your argument that it's not a copy is that the original buyer's version of the digital file has been eliminated. Correct. It's been eliminated. If that's not effective, it undermines your argument. That is correct. What we never had a chance to do was have a trial on those issues. The selling or gifting to friends is a copy because there's no argument about destruction of the original. Yes, outside of Redigi's system, absolutely right. I agree. Your argument is it's not only moved over by a process that the district judge didn't describe, but it gets there. It's that plus the destruction of the first copy. Absolutely. It has to be the movement of a copy. That's what we're talking about. There's a transfer of a copy. Just in my example, when I took this book here and I transferred it to this side of the podium, that's what Redigi's system does. The consumer's computer has nothing left of that file, just like there's nothing left of the book over here on this side of the podium. That's what Redigi's system does. Could you explain in sort of layman's terms the difference between version 1 and version 2? Yes. In version 1, the consumer downloads an Apple iTunes music file to the consumer's personal computer. And then, the consumer transfers that file from the consumer's computer to Redigi's server. Under Redigi 2.0, when the consumer orders the Apple file from Apple, that file is rerouted directly to Redigi's server. And the only time that file is ever saved on any hard disk will be in Redigi's server. And then, once it resides in Redigi's server, Redigi transfers ownership by what it calls this atomic transaction, which allows it to reset the user identification error. You left out a step. You left out a step. It goes to Redigi's server. From Redigi's server, the first purchaser, using the key, whatever you call it, gets access to it, and it then gets downloaded to the first purchaser's server. The person who uploads the song indeed can use Redigi service as simply a storage or cloud device and stream the music back as they want. That's inconvenient. You're much better off having it on your hard drive so you don't need to be connected with the internet and you can't play the song when you have no Wi-Fi. So most of the people, I think the briefs show that 60 to 90 percent download it rather than use it as streaming. I agree with that. Now there are two places. It's on Redigi and it's on the first purchaser. No. It's not on the first purchaser. It has it on its hard drive. Your question is the first purchaser acquires the music file from Redigi and then it downloads that file to its computer. Now do we have two copies? The answer to that is yes we do. I do not dispute that. What I say in that instance though is Apple allows the owner of a file to make personal copies of that file. More than one consumer of Redigi services download the same photo record or the same file? Let me explain that. That's a very good question. Each Apple music file that Apple distributes contains unique digital characteristics that distinguish that file from every other file. Redigi reads that digital information so it will know that my purchase of the latest Taylor Swift song it will be different from someone else's purchase of that same song from Taylor Swift. They both can purchase it. Pardon me? They both can purchase it. They both can purchase it from Redigi but those are separate considered separate files so that if I sell my one file to Redigi server I no longer have it left. But someone else, two other persons could download it from Redigi's cloud server. Once you become a purchaser, once you become an owner of the song then you would be allowed under Apple's license to download and make copies. Apple specifically has that in its license. When the original consumer gets it I can make copies of it. Who's the copyright proprietor? The copyright proprietor is Capital but Capital is operating under a license granted to Apple and no one is challenged, Capital is not challenged in terms and conditions of the Apple license. That's part of the whole process. Capital has licensed Apple to put it on Redigi's server? Capital has licensed Apple to distribute copies of Capital's sound recordings through the Apple iTunes. But we're talking about reproduction. Correct. You're saying that the license that's given by Capital to iTunes allows iTunes to permit the purchaser to make a personal copy? Yes. That's in the agreement with Apple. Make a personal copy while it resides on Redigi's server? It could reside on any server so long as it's for your personal use as opposed to making copies from someone else. If it's on my server I get to use it I get to make copies. If it's on Redigi's server and it's there lawfully, then I get to make copies from Redigi's server for my personal use. What I don't get to do is make copies for anybody else or to propagate more copies for other people. And that's what Redigi's server technology ensures that I cannot do. But Redigi can sell it to more than one purchaser? No. Redigi can only sell, well, it can sell the same book over and over, the same particular copy the second purchaser can then decide, I'm done with the song I want to put it back up on Redigi's server for sale, or now make it available for sale on Redigi's server, and then a third purchaser could come. But they can't do it, they can't, the second and third person couldn't have the same copy? No, they could not. So if you get two copies of Taylor Swift's newest song you could sell it to two different consumers. Yes, that's right. If you had 100, you could sell it to 100. To two different consumers. Absolutely right. And that's consistent with the very promise of the First Sale Doctrine. Capital licenses Apple to permit a copy of the file to reside on the purchaser's home computer and Redigi's server at the I'm not saying that. I'm saying that Apple allows a purchaser of an iTunes music file to take that file and put it on their computer and to make additional personal copies of that file for their own personal use. That's all. You started with the movement of the material over. I thought your point was the reason the end product is not a copy is because the first version is destroyed such that there was only one in existence No. No, that's not our argument at all, Your Honor. I'm sorry if I misled you. No, I may have misunderstood. No, it is not at all. It is just as with this book. We're not destroying the book on this side of the podium when we move it over to the other side of the podium. We are moving the book. That's what Redigi's technology does. It destroys nothing. It moves the file over in the same way. The personal copy that is permitted by the license. This is not really different. If I buy a song and I buy thousands of songs and I'm overtaxing the capabilities of my personal computer, my iPhone, I can rent space from Google or from any of those places and I can have the personal song that I bought I can have it on my laptop on my iPhone, on my iPad and I can also have it in a storage facility which is like Redigi except that those storage facilities are not involved in this first sale business. They're just stored. I can store it in the storage facility cloud of a separate entity, Google and store it for me. I completely agree with that, your honor. There's no dispute here. Let's go back to where you started with this. You moved the book over. Yes. The book was no longer over on your left. That's correct. With the digital file it's on the purchaser's hard drive. Right. It gets moved over to the Redigi server. Yes. Is it still on the purchaser's hard drive? No. What's happened to it? Let me explain. It's been eliminated, hasn't it? No. It's been moved. It's been moved because what happens was Redigi's technology takes an Apple MP3 file. It's compressed and then it breaks it apart into blocks of data. Think if you think of I've tried to come up with an analogy to try to help here, see if this works. If you consider a phono record to be like a completed jigsaw puzzle it resides on your computer. What Redigi's system does is it breaks apart that jigsaw puzzle into its constituent pieces. In the course of doing that, now all of those pieces you can no longer perceive the sounds. They contain the data for the sounds, but you can no longer perceive them on the consumer's computer because they've been broken out. You can only perceive an MP3 file when the entire file exists together. It breaks it apart like a jigsaw puzzle and then it transfers piece by piece over to Redigi's server where after all of the pieces come over, it is reassembled in Redigi's server and only then is that file perceptible again. You have a file perceptible in the consumer's computer and then as part of the process, that file no longer becomes perceptible during the transfer process. ...of selling to a second purchaser? Yes. That's what I'm talking about. Version 1.0. This is 1.0 I'm describing. Like the jigsaw puzzle, it breaks it into pieces, transfers piece by piece, and literally if we were allowed a trial in this matter, what we would show is that if you had a phonorecord comprising of ten blocks of data, Redigi's servers will take the first block and begin to move it. Now the file that remains in the consumer's computer only has nine blocks. One block is in transit. It comes over to Redigi's server. Now the next block comes and there are only eight left. One in transit and one comes over too and it transfers over just like pieces of a jigsaw puzzle and only when all those pieces are put back together again in Redigi's server you have a perceptible phonorecord that contains a perceptible sound recording. Does your argument depend on our agreeing with what you earlier said namely that a digital file is a material object? It's certainly I think an important part but no it is not absolutely crucial for this reason. It's not? It's not. Then tell me how it works if it's not a material object. Yes, okay. If it's not let's accept the district court's idea that a material object has to be a computer hard drive for a second. I strongly dispute that for a number of reasons. Well it has to be something physical. No there's no requirement of physicality. We quote in the London Sire case I thought was important. What did London Sire rely on to determine that electronic files themselves are material objects? It relied upon this court's decision in Matthew Bender v. West Publishing where there as they pointed out No, no, no now you're back to telling me that it is a material object, right? Well I'm saying that yes, you asked me if it was but I thought you were going to tell me that your position is right even if it's not a material object. I am and here's why because even if you have two different phonorecords, two different material objects the question is does the sound recording embedded in that material object is that being proliferated or duplicated in any way in terms of being embedded now in the new phonorecord? If it's not, as we claim it's not, then the case is very similar to the C.M. Pollis situation or the Lee, the art company situation that the Seventh Circuit looked at, in which it held that if you take a copyrighted work and simply move it from one medium, say it's on tiles, and move it to another medium, canvas you do not, you are not infringing the copyright owner's reproduction rights. Do you see yourself as a used bookstore or a used CD store? I'm sorry Your Honor, I didn't hear the first part of that. Do you see yourself as a used bookstore or a used CD store? That's exactly what the founders of Redigi did. They said we want to create the digital version of a used bookstore or a used CD store. That's exactly what they did and I believe they have accomplished that. I don't understand how you can say that materiality of the digital file is not essential to your argument when the right of resale, the first sale right under 109 allows you to resale a phonorecord and a phonorecord is defined as material object in which sounds. If it has to be a phonorecord to be subject to the resale right and a phonorecord has to be a material object, I don't understand your argument that it isn't essential that the digital file be material. My argument is this which is if you wanted to consider the phonorecord the digital code that comprises the phonorecord as having to reside on the hard drive in order for it to be considered a phonorecord. My point is if I am able to take the copyrighted work within that phonorecord the digital code that comprises the sound recording and without copying that digital code move it into a new material object there's no longer a sound recording over here. That's gone. I've moved it just as I did my book only it's the sound recording. Now I agree with you that that idea doesn't make as much sense as the idea of saying the entire electronic file is the phonorecord but even if you wanted to divide that up you would still have to be some level that the underlying sound recording had been duplicated or proliferated in some way and Redigi has submitted evidence, uncontradicted evidence, that that does not occur in its process. So you would then not be making use of 109A, you would simply be saying nothing has happened that gives rise to an infringement? Well no, I would like to say that but here's my maybe I could but you tell me whether I can or not. My concern would be without 109A for me to sell a phonorecord to someone else, a CD could become an infringement remember when we go back to the origins of 109 and Bob's Merrill, what does it teach us? It teaches us that the whole point of the first sale doctrine is to allow for the creation of a secondary marketplace in which consumers may lawfully sell or transfer their lawfully purchased copyrighted goods. That occurs with regard to CDs it occurs with regard to all forms of copyrighted goods except one, electronic goods, which up till now courts have not and I think because of Redigi's technology wasn't available it has been simply assumed that you could not transfer an electronic file from one computer to another without causing an infringing reproduction of the work to be created. But Redigi's technology has, I believe, solved that problem. Let me try it slightly differently as to whether the file is a material object are you saying we don't have to rule on that in order to decide whether there has been a valid first sale under 109 or in order to decide has there been an improper reproduction under 106 or both? Because as you started, I started asking you about copy but you ended up talking to Judge LaValle about first sale. So that's why I want to go back and try to sort it out. Well, if I guess 109 would apply, although it's a little bit interesting, but if all I have left if using Redigi's technology works just as I've described and I have nothing left but the district court wants to still say there's a phono record there there's still only going to be one phono record that contains the copyrighted sound recording after the whatever you want to call what's left over here in the consumer's computer isn't going to be anything the consumer can do anything with Are you saying it's both? You have made a valid first sale and you have not reproduced and made a copy and we can come to both those conclusions without deciding whether the file is a material object? I believe you can Simply again, because there has been no findings and the district court couldn't make any findings about how Redigi's technology actually operated That's why we spent some time talking about it to try to allow your honors to understand that this is not some hocus-pocus this is not some beam-me-up Scotty idea. This is real technology that actually does what we say it does You would agree that both rulings non-reproduction and first sale would be much easier for you if we did agree that the file was a material object Absolutely right, your honor. I completely agree with that. This may be a good place you've gone way over, although we take responsibility for all the questions we've asked you We'll hear also from the amicus with whom you were sharing your time a counsel for the amicus curia curia copyright law scholars and supportive appellants Thank you Hi, I'm Jason Schultz and I want to say thank you very much for granting us permission to participate in the oral argument today On behalf of the copyright law, scholars are interested in this case and perhaps the reason why waiting for 2.0 to be litigated may or may not make sense is that I think this case in some ways primarily resolves on statutory interpretation In other words, the way in which we think about the reproduction right and the distribution right will frame in some ways what facts matter and what facts don't and as we see it, section 1063, which your honor referenced, says that the owner of a particular copy or phone record in this case is entitled to dispose of the possession of that phone record and the core question in this case from our perspective is is the owner of a particular digital phone record able equally to dispose of the possession of that phone record? Now, Capital's argument I'm sorry, I'm not sure that this matters for your argument, but I don't think that's a correct characterization of what 1063 provides. What 1063 provides is not that the owner has the right to distribute. No one would challenge, no one is in a position to challenge the owner's distribution. What 1063 provides is that the owner has the exclusive right to distribute. Now, I'm not sure how that difference affects your argument, but I several times see both courts and briefs misstate that. It's not that 103 gives the owner of the copyright the right to distribute. He has that right regardless and no one can challenge it. It gives him the exclusive right, it gives him the right to prevent others from distributing. Absolutely, Your Honor, and I misspoke. What I was talking about was the owner of the phonorecord. The consumer who's purchased it. That in 109A... 1063 doesn't speak of the right of the owner of a phonorecord. Exactly. So let me reference, so my reference is to, in 109A it allows the owner of the phonorecord to be able to to be entitled to dispose of the possession of the phonorecord. So the question is if it's a digital phonorecord, are they equally entitled to do so? And so in Capital's argument and as the district court found it doesn't appear that they are. They must instead sell off their phone or their laptop or their iPad or their computer in order to do that. They can't dispose of the possession there. And so interpreting 109A here is going to make a difference in the sense of whether there's equal treatment, as the Kurtzeng decision said, between different types of copies and different types of copy owners. And what the Kurtzeng court did was basically talk about how all the other aspects of the Copyright Act all the other provisions that matter including the exclusive rights have to be interpreted in light of the language of 109A in light of the common law history in light of the context, in light of the practical copyright related harms that can happen in artistic scholarly commercial or consumer activities. And so when we look at this as an issue of law, we see that in the Kurtzeng case, the exclusive right of importation was interpreted in light of 109A. And then when we look at the cases in the patent realm, the Lexmark case and the Quanta case, which the Lexmark court explicitly said need to be harmonized across copyright and patent in terms of the exhaustion principle, in terms of the first sale principle, they again interpreted the exclusive rights to make sure that the first sale exhaustion doctrine survived in new technologies in new realms and new markets. Even back to the Bobbs-Merrill case, that was a case of statutory interpretation. In other words, the court there looked at the statutory right to vend, the modern distribution right, and said that when there was a conflict between the intellectual property right there and the personal property right of the copy owner there, Macy's, trying to sell the books, that they had to be reconciled using the exhaustion principle and the right to vend was narrowed to allow for the sale to happen, the secondary sale. Even going all the way back to 1901 in the Doan case, which was an early Seventh Circuit case predating Bobbs-Merrill, which talked about school books that had been burned and damaged in a fire. There, the Seventh Circuit even held that the books which had been sold and then sold on to a third party could even, to some extent, be reproduced in the sense of the covers were damaged, the illustrations were damaged, and other aspects of the books were damaged, and that the copy owner was able to reconstruct them or reconstitute them in order to resell them, or to make them suitable for resale. And so each time we look at these types of cases, we see that when the first sale doctrine or the exhaustion doctrine is in tension with exclusive rights of IP owners, that the courts have to harmonize this in a way where the exclusive rights have to essentially accommodate the first sale doctrine. Let me ask you this. I take your point that there have been situations of what you refer to as accommodation to keep the first sale doctrine viable. At the same time, Congress has put its toe in this pond a few times and passed very discreet statutes dealing with digital rights, digital material. So what I'm wondering, and I'm sort of, I think I know what you're going to say, but I want to give you a chance to grapple with it. Bearing in mind that the digital world is in some respects different than the fixed world of the books, the printed version. Whether it's legally different, another question, but it's different. We can agree with that. And Congress has shown a willingness to legislate rather precisely as to the digital world. Who should decide the issue you're tendering, us or them? Absolutely. That's a great question, and I think an important one. In some ways, the question is, what is the current rule? And like, what is the default rule as we stand now? Because if someone needs to change the law, the question is in which direction? So our argument, based on historical cases and based on the legislative history of both the 1909 Act, where Section 41 was the section governing the first sale doctrine, and the 1976 Act, which is now Section 109A, is that Congress is meant to adopt the common law rule. It's clear in legislative history meant to adopt the common law set of rules for sale and exhaustion more broadly. That is the default. That is where we stand. And in fact, the use of the word entitlement, which does not appear in any other exception or limitation in the Copyright Act, in Section 199A, is a very strong statement by Congress. Now, it may not be definitive, it may not be absolute, but it's a very strong statement about what the owner of a particular phonorecord is entitled to do. They don't distinguish there between analog and digital, physical and ephemeral copies in any sense. They say the owner of a particular phonorecord. Congress, in the legislative history, did debate the existence of computers and networks and things. It wasn't as if they were ignorant. They may not have been as well informed as we are now. Maybe facts and circumstances have, in fact, changed. And I think in the Digital Millennium Copyright Act and in the Digital Sound Recording Act and in all the other acts that have been passed, those were steps that they decided to make changes. But here, this is a statute that was enacted in 1976. Right? And as we take it, that's where the law was and that's where the law is. They didn't make any distinctions. The equal treatment principle that the Supreme Court talks about in the Kurtzsang case says that all copies will be treated equally. We think that's where we are right now. Now, if Capitol and other people want to go and change that, we can talk about that in Congress. But we think the rule as it stands doesn't discriminate against digital copies. Thank you. Oh, I just want to ask, if the Court wishes, I can mention for just a few minutes about fair use, if we want to talk about that. Otherwise, we can let it stand on the briefing. Thank you. We'll take your brief. And now we'll hear finally from Capitol Records, who prevailed below. And did you draft the injunction that included Version 2? I did. Congratulations. May it please the Court, I'm Richard Mandel from Cowen, Leibowitz & Lattman for the Capitol Record Plaintiffs. I'd like to begin, if I may, with the question of Redigi 2.0 since I was involved in the process. Basically what happened when we brought this case, we didn't know anything about Redigi 2.0. We challenged Redigi 1.0. That's what our complaint challenged. About nine days before the close of discovery, defendant introduced this system, Redigi 2.0, which we learned about for the first time in depositions, literally at the close of discovery. In briefing at the summary judgment stage, we explained to the Court that we don't view this as part of the case. We never brought a case about Redigi 2.0. There's no declaratory judgment about the validity or even an actual case of controversy concerning Redigi 2.0. And the Court agreed, and it was not part of what was adjudicated in the summary judgment ruling. When we came after the summary judgment ruling, we were approaching trial in the district court on the question of damages. Redigi was facing, you know, a conceivably multi-million dollar liability because there was something like 500 sound recordings and we had a claim for statutory damages. We negotiated a settlement agreement to eliminate the remedy phase of the case and avoid the need for a trial. And what we did as part of that is we actually had two separate judgments that were negotiated depending on whether or not a bond was posted for the appeal. One of the judgments was for $2.5 million and did not cover Redigi 2.0. And the theory for that was they had told us, and part of the consideration for the settlement was we have these investors, they're going to post a bond. If you prevail on appeal, you're going to be able to go collect Redigi 2.5 million dollars like that. It's going to be there. And, you know, we were skeptical because we didn't know that the investors really were going to come up with the money. And so what we negotiated was an alternative judgment which would be for an extra million dollars, $3.5 million dollars and a broader injunction that would include Redigi 2.0. That was part of the negotiated consideration of the settlement agreement. And so it was deliberate. They never did post the bond. The investors didn't come up with it. We entered the judgment for $3.5 million dollars and the broader injunction. And it's our view that we are perfectly entitled if this Court affirms the injunction as to Redigi 1.0 that Redigi 2.0 has been dealt with because that's been agreed by the settlement. It's included in the injunction. It's actually also even in the settlement agreement that if for some reason the district court wasn't prepared to enter an injunction as to Redigi 2.0, they were still bound to not use Redigi 2.0. There was no trial of the issue. No trial of the issue but part of the settlement, a negotiated settlement, and we think legitimately included in the injunction as a safe distance kind of rule. I mean this was a arm's length negotiation. That's the case. They saved money by doing it. I'm sorry? You're saying they saved money by doing it. Well, what they if they had posted a I guess they saved money in the sense that we're collecting $800 every two weeks from one of the principals and it's going to take a very long time to collect $3.5 million. So, yes. I mean we would have preferred to have $2.5 million bonded. Maybe I misunderstood. I thought your point was broader than that. That had they not agreed, you would have been entitled to your statutory damages which have been way in excess. Yes. Well, arguably. I mean they had arguments that we were entitled to less. I understand, but it was a claim. Yes, we had a claim for many, many millions of dollars. If they disable that claim, they reduce it to a $3.5 million judgment along with an injunction against 2.0. Correct. But at the same time at the same time it seems to me from what you describe that if Redigi sells to somebody else. Redigi has been enjoined by its own consent from implementing 2.0 but if they sell it to somebody else or somebody else just simply takes their technology and implements 2.0, there has been no adjudication there has been no adjudication that 2.0 is a violation of copyright laws so the issue would be wide open without any judgment without any ruling that is directed to 2.0. They agreed, okay we won't do it for financial reasons or whatever. We won't fight 2.0 but that doesn't prevent somebody else from coming up and reinstituting the resale market. It would depend on the effect of the judgment. I mean the judgment applies to successors and you know it would be a rule 65 question as to how broad. I mean that's a consent judgment that was entered and that's a valid contractual agreement and then that Redigi for its own personal interest can sacrifice the interests of all first purchasers who would like to resell their technology and all persons who would like there to be such a market to get a court to consider whether 2.0 does or does not violate copyright. Clearly if somebody else came along and implemented technology like Redigi. Implemented 2.0 Well I think there's a legitimate issue that I haven't researched and I'm not prepared to address today and I'm certainly not going to waive the right that we think conceivably capital could go after depending on what it means to be in privity or active concert and participation You're not saying the world is bound, you're saying Redigi's bound. And possibly others who are in privity with Redigi. Alright, the normal rules of who's bound by them? Correct, that's all I'm saying. But not the whole world. Not the whole world to the extent that they implement something separate from Redigi 3.0 Of course, and that would be free to be adjudicated. But if somebody comes along and studies Derigi's technology and says well, we're going to give this a shot because no court has adjudicated it the fact that Derigi has been prohibited from exploiting it doesn't mean that it is illegal technology. Correct, I agree. So this judgment then does not settle whether there can be a resale marketplace based on the technology which Derigi calls 2.0 Not generally as to the world. Council, why isn't the technology like a used CD store? Redigi 1.0 or 2.0? Either. For a very simple reason basically that it's not possible to transfer a copyrighted work from one computer to the other within the meaning of the copyright act and the clear statutory definitions without making a reproduction. That's the simple answer to it. And that's basically what Judge Sullivan found as a matter of strict statutory interpretation. That's a simple thing to say but why is it necessarily the answer against the argument that lodging the new thing in the computer is in some ways like putting a phonograph record on the disc and putting the needle on and turning it on that what it's doing is taking the digital file and putting it in some machinery that permits it to be heard. I think the reason is that phonorecords are defined under the statute as material objects That's what it comes down to. It does come down to that and as the Supreme Court reminded us just this year in the Star Athletica case that's what copyright cases are. They're cases of statutory interpretation and we give the statute its common ordinary everyday meaning and quite frankly the notion that material object doesn't include doesn't contain an element of physicality is just a blatant misreading of the plain meaning of the term. The law is now but wouldn't you agree that most people who transfer music do it digitally today? You would know better than we would. That is a growing trend and it's all the more reason why this issue is important and picking up on Judge Newman's point Congress has consistently refused to enact a digital first sale doctrine. I mean this is not something new at the time of the digital millennium copyright act when they were massively revising the copyright laws to bring it into the digital age there was a proposed bill that would have created a digital first sale doctrine and what Congress did, they enacted a lot of things. I mean the digital millennium copyright act is a very comprehensive piece of legislation. They did not enact a first sale doctrine. What they did do actually by statute is refer it out to the copyright office to study it and report back and make legislative recommendations and what the copyright office came back with and recommended first they looked at the existing law and said something that I think was not really very controversial which is the existing first sale doctrine doesn't cover this because there's a reproduction and they went over that at length and that's the basic position that Judge Sullivan took in this case. But then they went on to say why they didn't think it was a good idea to enact a digital first sale doctrine taking all of the competing policies into effect and you know your brief gave us a dictionary definition that is broader than the definition you just gave. It has to be something physical. In footnote 3 on page 20 you cite the American Heritage Dictionary as saying this is of the word material. Defining material as quote of relating to or composed of matter and object as something perceptible by one or more of the senses especially by vision or touch. Well one or more especially by vision or touch is not exclusively by touch. Well I think relating and this definition that you gave us in your footnote is broad enough to cover something that is perceived by vision what's the difference? It says relating to matter. I don't think a digital data which are a series of zeros and ones can properly be considered matter and the legislative history bears this out. I mean if you look at page 56 of the House report they specifically talk about the definition of phonorecords as being physical objects as to be distinguished from the aggregation of sounds. So you know I think the ordinary understanding of what material object means, what the legislative history says all points to a physical object and beyond that if you look at the cases they say the same thing. There's not a case that has ever said that an electronic file is a phonorecord. I mean the closest thing to it is London's well that's correct but the closest thing to it would be London's It fully supports our position and in fact London's has a long long section explaining that a digital file is material Well but if you look at what they found, they found a distribution in that case and they found it even though you know that was a file sharing situation where you start on one user's computer and you end on the other and they said that was good enough to be a distribution of material objects It doesn't matter that the material object doesn't exist throughout the whole transaction It exists at the beginning on one computer and it's created somewhere else at the end of the transaction It's not talking about the electronic file. The electronic file always existed. What made it a distribution was the fact that there was a material object to begin with and a material object to end with and they said it doesn't have to be the same material object for it to be a distribution The problem that it doesn't have to be the same material object for it to fall within the First Sale Doctrine. That's just basic 1098 plain language of the statute. You have the right to dispose of the particular phono record that you own, not a copy and the First Sale Doctrine has never extended to the right of reproduction I mean as much as they want to talk about the First Sale Doctrine and it's pedigree and it's history and we agree it's an important doctrine but it has never under any circumstance been interpreted to allow a reproduction. In fact that's just contrary to the whole notion because the idea of the First Sale Doctrine is to draw a distinction between physical tangible property that you own and have a right to sell and the intangible copyrighted intellectual property that's the copyright owners and the right of reproduction is implicated in the electronic context and 106.3 gives the copyright owner the exclusive on the right to  phono records. Correct. Now isn't that violated? Isn't that right violated if somebody comes and distributes somebody without authorization starts to distribute digital files? It is and I think that's what London Sires said and actually all the cases have said that but none of them have said it because... That person is not distributing something that's not material. Well the interpretation that's been consistently applied by the courts and we've cited a lot of the cases that have found a violation of the distribution right has been that as long as the end result of it is a material object that that is enough to be a distribution. You start with a material object and you end with a different material object you've still distributed a copy in the same way that if I photocopy my book, you know I throw the book out and I then sell my photocopy, I violated the distribution right and I also don't have a first sale defense because I had no right to sell a reproduction of it. I only have a right to sell the original thing that I own. Am I right? You are acknowledging that there is no first sale opportunity with respect to a digital file. Well no practical way other than selling your computer. And that you don't claim that that's a realistic possibility. Well I mean not a satisfactory one to people. The practical purpose is if we affirm the first sale doctrine does not permit a first sale of a digital file. I think that's correct but to put that again in context I'm not saying that's bad that's your position and that's the consequence of this judgment. That's correct and let me say why I think that's perfectly fine. First of all, as I said, Congress had before it a digital first sale doctrine. It sent it out to the Copyright Office to make legislative recommendations as to what should be done about it. The Copyright Office came back and said we do not recommend a digital first sale doctrine because it poses too great a harm of risk to the copyright owner. Congress has never enacted a digital first sale doctrine since that. When you say that Congress sent it to the Copyright Office how was that accomplished by the Congress? They actually passed a law and we cite to the public law. Statute did it. Yes, part of the Digital Millennium Copyright Act. This is not a reference by a committee. No this was actually a statute that asked for a report and recommendation on the effective technology and that statute is Congress saying that there does not now exist a first sale right of a digital copy. I think that's right. At least there's not clearly a right under the statute. They'd like the Copyright Office to weigh in. What the Copyright Office said in its report and I think it's quite persuasive, they go into before they get into the recommendation phase, they look at the existing law and they say why there is no digital first sale right. Now Redigi in their brief tries to create the illusion that somehow that's outdated because that was 2001 and they talk about the making available report that the Copyright Office issued in 2016 but somebody forgot to read the footnotes because there's actually a footnote in that footnote 94 where the Copyright Office says it has been said to us that if there's a distribution of a digital file then it is necessarily a digital first sale also. We disagree with that. We don't accept that characterization and what do they cite? Say it again? What the Copyright Office said in its report in footnote 94 when they were looking at the question of whether there is a violation of the distribution right in the electronic transfer of electronic files and they said they concluded there was as every court has said, as London Sires said, as Cassini said from the Supreme Court, as Grubel said citing a bunch of cases, I mean there's a lot of law that has recognized that and they agreed with that and they actually cited what they thought they referred to as a particularly thorough analysis by the London Sire Court in talking about the appropriate segment of the hard drive as being the phonorecord but they then go on to say in a footnote that you know it's been raised by some of the people that if there is a digital distribution then there also must be under 109A a right of first sale a digital first sale. We disagree with that because you're not disposing of the particular phonorecord that you started with. They cite to Judge Sullivan's opinion below. So for Redigi to suggest that the Copyright Office has a different view of this now is just completely wrong. I mean if you look at the 2016 report it couldn't be clearer that the Copyright Office continues to adhere to the same view. I think Judge Sullivan decided this case incorrectly. Now they can say the Copyright Office is wrong or Judge Sullivan got it wrong but certainly that's what they think. The motivating thing of the Copyright Office report expressing a problem with having first sale applicable to digital having 109 cover digital resale of digital files is the risk of reproduction, the risk of proliferation from it and the district court never dealt with the challenge by Redigi saying we have solved that because we have our technology prevents the proliferation. Isn't that kind of a crucial issue? No I don't think so actually. I think what the district court did was absolutely correct. What the district court said I think in essence and first of all if you look at the footnote where they cited all the admissions Redigi made that there really is a copy at the start of the case. Just a second because you do a lot of briefing on that but that doctrine that you talk about is with respect to admissions in fact and whether there's a copy a violative copy is not a question of fact it's a question of law so I mean it doesn't help them that they've said that but the doctrine that you cite is just inapplicable. Well in any event what the district court really said and I think this is absolutely correct is I don't have to reach the question I mean I think it found it far fetched and we can talk about why and all the admissions and what it really means but it ultimately doesn't matter the district court said because this is a question of statutory interpretation and the clear language of what 106.1 means to reproduce a phonorecord if you embody a copyrighted work in a new material object you have reproduced it and you know I can quote from the Senate and House report which say read together with the relevant definitions in section 101 the right to reproduce a copyrighted work in copies of phonorecords means the right to produce a material object in which the work is duplicated. What the court was saying is I don't really care about your semantics because at the end of the day you've embodied a copyrighted work in a new recognition you have reproduced the copyrighted work and violated the reproduction right and about their point that we should take from the Supreme Court's Kirsten decision guidance perhaps to read the first sale doctrine as vigorously or as we can. You know I really disagree with that because I think if you look at Kurtzhang Kurtzhang was deciding a completely different issue it was talking about physical copies and it was interpreting specific language the issue was different but the net result was to be sure there is a strong first sale right. Well, but it was looking at specific language what does it mean to be created under this title? They had to construe different language but in doing it they said we've got to be sure we've got a first sale right here. Well that's true but the first you know So they're inviting us to say we should similarly read the first sale right to include digital files to make it as vigorous as the Supreme Court did with imported works. The big problem with that is that the language is so completely different. In the case of Kurtzhang You're saying this language just can't be interpreted. This language under 109A talks about disposing of the particular phono record that you own. And I really return to my basic point from Bob's Merrill straight through first sale has never been about a defense to reproduction it's only a defense to distribution. It has Congress has been very clear if you look at 109C which relates to the display right and has said the particular owner that's what allows museums to display works if they own the particular object of art or if you look at 109E where they've enacted a special limitation to the public performance right for video arcades for the public performance of video games I mean they have legislated the first sale doctrine very carefully it's a very carefully drawn balance and it has never under any circumstance extended to reproduction and by the way you know when the Commerce Department looked at this in 2016 again you know this is just last year they also reached the same conclusion as the copyright office this was the Commerce Department Internet Policy Task Force and they reached the conclusion that a digital first sale doctrine posed too great a danger of risk to copyright owners they also pointed out that there have been lots of there's been a proliferation of other market opportunities things like subscription services where you can on demand you know subscribe and stream any recording you want the fact that iTunes people owners can make multiple copies and share among family members there have been a lot of things that have developed in the marketplace to give some of the benefits of what a first sale doctrine would do and the conclusion the Commerce Department reached is this is working quite well and they said there's no evidence that there's even any interest in a resale market there's actually from their study of the question they found no evidence that this is something that actually is filling a market niche so I would say that this issue has been extensively studied by government studied by the legislature which has heard witnesses Congress has been aware of this for 20 years it's known that this is something it can enact it thought about enacting it it has chosen not to enact it everybody who's recommended the issue and who studied it has said don't enact it and I just think it would be a grave overstep for the court in the face of that history to come in and interpret phono records and the first sale doctrine in a way that has never been interpreted by anybody so this is a good place to stop thank you Mr. Welch you have one minute make it carry so I will try to be brief thank you very quickly let's go back to what is the core of this case and I think it came out in the dialogue you just had it's whether or not this court accepts the idea that a phono record requirement of material object precludes an electronic file from qualifying as a phono record again London Sire quoting and I believe correctly concluded that electronic files are material objects now the only issue to be decided is does it contain does it embody a sound recording fixed in the digital file yes it is and does that digital file contain a code that allows that embedded sound recording to be perceived by the computers mp3 player yes it does it now satisfies all the requirements of a phono record and the idea of having to now save it on a hard drive to make it a phono record is just surplusage the file itself already satisfies all the requirements there is no additional requirement left to be satisfied the way it satisfies material is how material is because it as your honor this court said in Matthew Bender a material object is an object that satisfies the functions of a phono record or a copy that is it must embody a copyrighted object or sound recording and it must allow for that recording or object to be perceived and if it satisfies those requirements and I could read the definition of phono record if you'd like I have it here then it is a phono record and my point is digital file itself satisfies all of these and the absurdity of going with is not only the absurdity of having to sell your phone in order to convey a 99 cent Apple file but I would also remind this court of its decision in AG versus Paramount back in 1996 where the record companies came there dealing with synchronization rights and in that case one of the things the court decided is it said for there to be an authorized distribution there must be an exchange of a material object between the distributor and the distributee well if Capital wants to say that the phono record itself is not a file then how is Apple distributing a phono record to a consumer under their own theory it's not the only way you can find that Apple is distributing a phono record to a consumer is by finding that the phono record that the electronic file is itself the phono record because that is the only thing that changes hands between the two parties Apple doesn't need anyone's permission other than Capital's correct but remember it doesn't but to constitute a distribution is my point in AG this court said to constitute a distribution as distinct from a performance there must be an exchange of a material object that doesn't need to satisfy anybody that it's constituting a distribution the only place that the issue comes up is if somebody else goes and does something that Apple says is a violation of its exclusive right to distribute then the issue arises Apple has that right even if it doesn't do anything if it doesn't sell anybody anything it still has under the license from Capital the exclusive right to distribute and I completely agree with that your honor but I may be talking past you let me try again what I am saying is not that whether or not it's authorized or not I'm saying whether or not it is a distribution put aside whether it's authorized or not is it a distribution as opposed to a performance when done by an alleged infringer is that a distribution if the first sale doctrine does not apply to what ReVigi does then I would concede that that would be a distribution because without the first sale doctrine copyright owners have the right to impose whatever controls they want on the use of copyrighted goods and again going back to Kirsten your honor the Supreme Court did articulate this equal treatment principle there and the publisher said there well wait a minute judge we've been doing this all along we have a whole business model that's built around this geographical distinction that we're doing and the court said well wait a minute the first sale doctrine is not intended to simply further the particular business models of claimants rather the first sale doctrine contains an equal treatment principle that applies broadly to all sales or transfers of a particular recording it didn't allow for a copyright owner to have downstream control over certain kinds of goods but not over others that's completely inconsistent with the equal treatment principle so what the court said in Kirsten and what I think is the proper analysis here is it looks and it says has Congress weighed in to say no there should not the first sale doctrine should not apply to digital goods Congress has not done that it's done the opposite it's extended the copyright act to cover digital transmissions and in extending the copyright act to cover digital transmissions it's also extending the first sale right you don't just extend part of the copyright act and say no these are digital so everything from 600 on in the copyright act doesn't apply no it applies across the board that's the equal treatment principle. Comment on footnote 94 that your adversary referred to footnote 94 in the 2001 copyright report I'd have to go back and take a look at it here's what I have to say about the copyright reports generally our arguments are not based upon policy reports by the commerce department or copyright reports like the ones that are cited again if you go back to the 2001 copyright report what is the kind of technology that the court is concerned about there it's what it calls copy and delete technology where you literally are creating a second copy and then subsequently deleting it at some point in time that's not what redigi does and the copyright office specifically says that's the kind of technology we're focusing on if other technologies arrive in the future we'll have to address it when it comes they have never addressed redigi thank you thank you all for a very interesting argument a reserved decision that is the last case on our argument calendar so I'll ask the clerk to adjourn court